IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

JOHN TERRY CHATMAN, SR., )
)
Petitioner, )
)
v. ) Case No. CIV 10-071-RAW-KEW
)
OKLAHOMA DEPARTMENT )
OF CORRECTIONS, )
)
Respondent. )

## REPORT AND RECOMMENDATION

This matter is before the Magistrate Judge on petitioner's petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254. Petitioner, a former inmate of the Oklahoma Department of Corrections, is attacking his conviction in Muskogee County District Court Case Number CF-2006 for Assault and Battery with a Dangerous Weapon. He sets forth the following grounds for relief:

I. The trial judge refused counsel the right to subpoena witnesses, and counsel also refused to subpoena witnesses on behalf of the petitioner, all in violation of the Sixth Amendment.

II. Counsel did not raise the issue of petitioner's mental and physical health, which includes post-traumatic stress disorder and congestive heart failure.

III. Under the Oklahoma Statutes, petitioner had the right to defend himself, but the prosecutor stated in closing arguments that petitioner was not entitled to self-defense. Also during closing arguments, the prosecutor included misrepresentations of evidence and comments about petitioner's guilt.

The respondent concedes that petitioner has exhausted his state court remedies for the purpose of federal habeas corpus review, and the following documents have been submitted to the court for consideration in this matter:

A. Summary Opinion affirming petitioner's conviction and sentence. *Chatman v. State*, No. F-2009-383 (Okla. Crim. App. Jan. 27, 2010).

B. Petitioner's direct appeal brief.

C. The State's brief in petitioner's direct appeal.

D. State court record.

E. Transcript of petitioner's jury trial.

**Facts**

Martin Cherry, the victim, testified that on February 14, 2006, he walking from a car to his aunt's house, when the man next door began "talking and cussing and cussing and talking, just raising a lock of ruckus." (Tr. 83-85). He paid him no attention and went into his aunt's house for a haircut. (Tr. 84). About 20 minutes later, Mr. Cherry came out on the porch with his two nephews. (Tr. 86). Mr. Cherry explained what happened next:

> A. We was standing--me and my two nephews was standing up on the porch and the young man was still over there cussing up a storm and everything and wasn't nobody paying him no attention. I mean, he came around from around on that side of the property coming around and was still talking and everything and ain't no smoking--you know--it ain't nowhere to put any cigarettes out on my auntie's porch, so I reached up off my auntie's porch to throw my cigarette down and he swung at me, I ducked. I swung back and hit him back.
>
> Q. All right. What happened after you struck him?
>
> A. Nothing. We locked up and that is when I felt that he stuck me on my right side.

(Tr. 86). Petitioner was identified as the attacker. (Tr. 88).

Mr. Cherry had been stabbed in his back shoulder and his lower back. (Tr. 87, 89, State's Ex. 13). He was taken to the hospital by ambulance, where he stayed overnight. (Tr. 88). Blood drops led from where the stabbing occurred to petitioner's front door. (Tr. 128, 135-38; State's Exhibits 10-11). No one answered the door to petitioner's house when a police officer knocked, so a search warrant was obtained. (Tr. 129, 161). Inside the house, blood was found on many items, including a single-blade pocket knife (Tr. 162-68; State's Exhibits 19-34). Petitioner had wounds on his hands when he was arrested. (Tr. 130).

**Standard of Review**

Under the Anti-Terrorism and Effective Death Penalty Act, federal habeas corpus

relief is proper only when the state court adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

**Grounds I and II: Ineffective Assistance of Counsel**

Petitioner alleges his trial counsel was ineffective in failing to secure several witnesses who petitioner believed would have testified about the reasonableness of petitioner's fear of Mr. Cherry under the circumstances. Petitioner also wanted to recall a witness to inquire about Mr. Cherry's leaving the porch and approaching petitioner in a threatening manner. Further, trial counsel allegedly was ineffective in not raising the issues of petitioner's congestive heart failure and post-traumatic stress disorder. The Oklahoma Court of Criminal Appeals denied relief on these claims, finding "Mr. Chatman was not denied his constitutional right to the effective assistance of counsel." *Chatman*, No. F-2009, slip op. at 1 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

The record shows that on the first day of trial, the court held a hearing in chambers regarding witnesses petitioner wanted to call to testify and the issue of his mental and physical health:

> THE COURT: Let's go on the record. We're having a hearing in chambers at the request of the defendant. The attorneys and Mr. Chatman is present. I think we need to start--Mr. Hilfiger, maybe you can kind of tell me where we're going with this?
>
> MR. HILFIGER: Well, I think where we are right now is a concern on Mr. Chatman's request for calling of certain witnesses and things which he informed me of today and some of these witnesses--well, I'll just talk about two of them. One of them is McNeil that he wants me to call who testified at the preliminary hearing and who also wrote a statement. I do not wish to call Mr. McNeil because I don't think Mr. McNeil has anything to say that would help Mr. Chatman. At the preliminary hearing he basically said he didn't remember anything that day. In his discovery statement he said that Terry swung at Mr. Chatman--I mean, Terry swung at Mr. Cherry.

3

MR. CHATMAN: No. It didn't say that. Can I say what it said? I mean, I didn't mean to interrupt you but it said when he came outside the two men were fighting. That is what he said in his statement.

THE COURT: Okay. That is what he said in his statement? So why would you want to call him Mr. Chatman? What good--what would that be any different that what everybody said?

MR. CHATMAN: He got to the preliminary he didn't remember anything and it didn't show that I started anything. I was trying to defend myself. I mean--

MR. HILFIGER: It says here: "I walked outside, they were arguing and started fighting and as Terry was swinging I saw blood coming from Martin's back. I seen Terry run up the front door." And, Judge, I just think that is going to be adverse.

THE COURT: Yeah. You want to put a witness on that actually saw you stab the guy, Mr. Chatman; is that right? Is that what you want to do? Let's don't leave any questions.

MR. CHATMAN: He said he didn't remember anything at the preliminary.

THE COURT: Beg your pardon?

MR. CHATMAN: At preliminary when he was testifying then he didn't remember anything. This is what he said.

THE COURT: Okay. Well--

MR. HILFIGER: That is why--

MR. CHATMAN: I understand what you are saying.

MR. HILFIGER: The next witness he's talking about is this Valerie Miller and I do not--and, of course, I just was informed today that she lives in Maryland or she's moved but we could have the opportunity to read the transcript if there was--if that was proper. The problem on her testimony that I do not want to call her is that two things. Number one: She is indicating in her transcript testimony that Mr. Chatman is--I'm going to use the word taunting by the statements that Mr. Chatman is making toward Martin Cherry and then she also further confirms that the fight occurred by the rock garden in the yard.

MR. CHATMAN: Right there by the sidewalk where the pictures were at by the sidewalk.

THE COURT: You've lost that one Mr. Chatman by knowing two months ago that she moved and you not telling him anything about it until Friday.

4

MR. CHATMAN: I didn't know two months ago. I don't stay here in Muskogee.

THE COURT: Well, I think you told me that you knew quite some time ago.

MR. CHATMAN: I said about two weeks ago.

THE COURT: Two weeks ago and you didn't bother to tell him until today or Friday.

MR. CHATMAN: Well, look--

THE COURT: It is too late to go for that so what else do you got?

MR. CHATMAN: What about my medical records. He did not subpoena my medical records. I have congestive heart failure. He knows that. I'm disabled.

MR. HILFIGER: He has medical records--

THE COURT: What--that is of no relevance whatsoever at this point.

MR. CHATMAN: Why? I have physical limitations, somebody tried to hurt me. I mean, come on, Your Honor.

THE COURT: The testimony is so far you got to put somebody on that you didn't leave your house and come to his house. . . .

MR. CHATMAN: Okay. So I don't have a right to defend myself?

THE COURT: No, sir. No, sir. You don't have--actually the law is you can't stab somebody if--you can't come to a fist to cuffs and stab somebody is basically what it boils down to and you are the one that entered the yard where he was rather than him coming to you is what the testimony has been so far. Maybe there will be something else. What else have we got to talk about Mr. Hilfiger?

MR. CHATMAN: I want to subpoena my medical records.

THE COURT: Okay. You know--

MR. CHATMAN: I really want them because I am--I'm disabled and we had that understood when I came in here. That is what I get a check for every month. I have congestive heart failure. That is relevant.

THE COURT: No, sir. That is not relevant.

MR. CHATMAN: How come it is not, sir?

THE COURT: Because the testimony is so far you came and voluntarily engaged in an altercation with him. You left your house and your yard and voluntarily came over to the other yard.

MR. CHATMAN: I was not walking down the street. I didn't--I did not make no verbal threats.

THE COURT: I haven't heard any testimony to the contrary. If I see that put on then I might say--we might see where it is at that point.

MR. CHATMAN: So you are saying it is not excusable. I have congestive heart failure and he can run out there and hit me and I can't defend myself. I have congestive heart failure.

THE COURT: You cannot use a knife to do it, no, sir.

MR. CHATMAN: Well, it says in the statute right here it says any necessary force may be used to protect from wrongful injury to person or property or ones self or wife, husband and child.

THE COURT: You need to talk to Mr. Hilfiger and I'm sure--

MR. HILFIGER: Judge, I have talked to him and talked to him and talked to him--

THE COURT: I understand.

MR. HILFIGER: --about defense, self-defense, what is excusable and just exactly what you are saying, Judge, that you can't come to a fist fight and defend yourself with a knife.

MR. CHATMAN: Well, what is that make my day law when--I mean, sir, I was attacked. I did not make no verbal threats. I didn't make no threats.

THE COURT: I haven't heard any testimony to support that yet that would even come close to even considering admissibility of any medical records of what your--

MR. CHATMAN: I'm disabled.

MR. HILFIGER: But you haven't testified to that.

THE COURT: That is not relevant at this point.

MR. CHATMAN: I testified when we was in the hearing.

MR. HILFIGER: That is before a jury.

6

> MR. CHATMAN: We can't subpoena the records to show that I am disabled? That is my Sixth Amendment.
>
> THE COURT: It does not make any difference Mr. Chatman of whether you are disabled or not as to this case.
>
> MR. CHATMAN: Why could it not? That would mean I would have a right to defend myself. I have physical limitations. Yes, it does. I have shortness of breath. That man charged me and said--Ezzard at least said the man charged me.
>
> THE COURT: You have to testify to that for us to get anything to that and I think Mr. Hilfiger has tried to convince you to do that.
>
> MR. CHATMAN: The witness testified to that, Judge. He charged me.
>
> THE COURT: That would not entitle you to get your medical records in or to pull out a knife and stab somebody.
>
> MR. CHATMAN: Well, he should have had my medical records for a long time.
>
> MR. HILFIGER: I've got your medical records. They are right here.
>
> MR. CHATMAN: Well, what does it say about my congestive heart failure?
>
> MR. HILFIGER: Back in 2002--
>
> MR. CHATMAN: I take medicine right now.
>
> THE COURT: Mr. Chatman, that is not helpful to the case that we're dealing with. Because you've got a bad heart based on the evidence that has been presented you can't pull out a knife and stab somebody. . . .

(Tr. 145-53).

Based on the hearing, petitioner's counsel decided not to call Mr. McNeil or to read Valerie Miller's testimony. (Tr. 171). Petitioner also asked to recall Witness Ezzard Lee, who had testified he cut Mr. Cherry's hair on the day of the incident and had witnessed the fight. (Tr. 110-13, 171-72). Petitioner wanted to ask Mr. Lee about Mr. Cherry's "charging" him, along with other questions, but counsel stated that nothing could be accomplished by having Lee testify further. (Tr. 172):

> THE COURT: What question would you ask him?

MR. CHATMAN: I would like to ask him once again that--because he said--what is it . . . that Mr.--the alleged victim had ran off the porch and charged me.

THE COURT: Mr. Hilfiger did a good job of getting that out. I think it is pretty clear he came out pretty quickly. I think it is pretty clear of the two of you advanced each other. Evidently from the testimony at this point [it] is uncontradicted that the two of you advanced to each other evidently with quite a war of words between the two of you. It is not clear who threw the first lick. It is certainly not clear of why you went over there to that yard from your house. But what else would you ask him because that has already been established. . . .

MR. CHATMAN: I never threatened him. And it says that he charged me. The testimony he gave on the witness stand today is totally different from the testimony he gave at preliminary.

THE COURT: And was that; what is different about it?

MR. CHATMAN: He said that he stepped off the porch and charged. He said that I was out at the T of the sidewalk from the public sidewalk from the privacy sidewalk and that is where he ran, Mr. Cherry charged me.

THE COURT: Mr Hilfiger has I think established it pretty well that both of you--you know.

MR. CHATMAN: Okay. Well, what about him coming over to my mother's house, he came places where I frequented. He went to my mother's house. It says he went to my mother's house which Mr. Lee said he went to, he went to my son's house, which my son answered the door where he confronted my--huh?

THE COURT: I don't know what good that would be about this incident today.

MR. CHATMAN: Because he was stalking me. He wouldn't--I mean, what motive would I have to stab him, Your Honor? I'm asking you. He ran and charged me. I wasn't mad. His wife divorced him, she didn't divorce me and I'm trying to see what probable cause do I have to stab him other than he attacked me. If he would have stayed on the porch he said he had a cell phone he could have called--if he was scared call the police. I have congestive heart failure. I would like my records subpoenaed. Well, we have them here. I mean, this is not an issue, my health?

THE COURT: No, sir. Not in this case at this point. Are you going to testify?

MR. CHATMAN: No. I would like to have this presented as evidence, my medical records.

8

THE COURT: Well, that will be denied.

MR. CHATMAN: Can you present that as evidence like he's doing about the stabbing--I mean, the pictures and everything, you couldn't say, well, Mr. Chatman suffers from post-traumatic stress disorder.

THE COURT: This is a stabbing case, it is not a medical malpractice case Mr. Chatman.

(Tr. 173-76).

THE COURT: ... I'm not going to allow you to call Mr. Lee back. ...

(Tr. 177).

In *Strickland v. Washington*, 466 U.S. 668 (1984). the United States Supreme Court set forth the two-part test for determining the validity of a habeas petitioner's claim of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687.

> To prove that his counsel's performance was deficient, [petitioner] must show that his counsel "committed serious errors in light of prevailing professional norms such that his legal representation fell below an objective standard of reasonableness." *Duvall v. Reynolds*, 139 F.3d 768, 776–77 (10th Cir.) (internal quotations omitted), *cert. denied*, 525 U.S. 933 (1998). [Petitioner] "must overcome a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance that might be considered sound trial strategy." *Moore v. Reynolds*, 153 F.3d 1086, 1096 (10th Cir.1998) (citing *Strickland*, 466 U.S. at 689, *cert. denied*, 526 U.S. 1025 (1999). To establish that counsel's deficient performance was prejudicial, [petitioner] must also show that, but for his counsel's errors, there is a reasonable probability that the outcome of the proceeding would have been different. *See Duvall*, 139 F.3d at 777.

*Hawkins v. Hannigan*, 185 F.3d 1146, 1152 (10th Cir. 1999).

Here, it is clear from the record that trial counsel's decision not to subpoena Mr. McNeil or Valerie Miller or to recall Mr. Ezzard Lee was based on reasonable trial strategy,

because their testimony would not have assisted the defense. Petitioner was allowed to admit the statement he made to Officer Felts that he was in fear of his life and defending himself. (Tr. 156). Petitioner's medical and mental health history was irrelevant, and the court did not allow that evidence to be admitted.

After careful review, the court finds the absence of petitioner's requested witnesses and the medical evidence did not prejudice the defense. Therefore, the Oklahoma Court of Criminal Appeals' decision was not contrary to, or an unreasonable application of, clearly established federal law. The court further finds the OCCA's decision was not based on an unreasonable determination of the facts in light of the evidence at trial. *See* 28 U.S.C. § 2254(d). Grounds I and II of the petition fail.

**Ground III: Prosecutorial Misconduct**

Petitioner alleges in Ground III that under Oklahoma law, he had the right to defend himself. He claims that during closing arguments, the prosecutor stated petitioner was not entitled to a defense of self-defense. The prosecutor also allegedly included misrepresentations of the evidence and comments about petitioner's guilt. On direct appeal petitioner cited the following portion of the trial transcript in support of this claim:

> Self-defense only applies if you determined that under these circumstances the defendant acted like a reasonable person. The facts show you he had the intent to do the bodily harm when he left that porch from his house; otherwise, he would not have had any need to have that knife open and ready to be used to stab Martin Cherry. Again, the instruction says self-defense is not available to a person who was the aggressor. That is the defendant. Who provoked another with the intent to cause the altercation. That is the defendant. Who voluntarily entered into mutual combat. That is the defendant. Self-defense does not apply to the defendant. It does to the victim Martin Cherry.

(Tr. 207-08).

The OCCA denied relief on this claim as follows:

> ... [W]e decline to find that prosecutorial misconduct deprived Appellant of his right to a fair trial. The prosecutor did not misstate the evidence or the law and did not improperly state an opinion of Appellant's guilt. Rather, the prosecutor properly discussed the evidence and the reasonable inferences drawn therefrom. *Quillen v. State*, 163 P.3d 587, 590 (Okla. Crim. App. 2007). There was no error here, plain or otherwise.

10

*Chatman*, No. F-2009-383, slip op. at 2.

> In a habeas corpus action, claims of prosecutorial misconduct are reviewed only for a violation of due process. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a failure to observe that fundamental fairness essential to the very concept of justice." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974) (citations and quotations omitted). In order to be entitled to relief, [petitioner] must establish that the prosecutor's conduct or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 643. This determination may be made only after considering all of the surrounding circumstances, including the strength of the state's case. *See Darden*, 477 U.S. at 181-82.

*Malicoat v. Mullin*, 426 F.3d 1241, 1255 (10th Cir. 2005), *cert. denied*, 547 U.S. 1181 (2006).

Here, the court agrees with the OCCA's determination that petitioner was not deprived of a fair trial. The prosecutor's arguments told the jury that the evidence did not support petitioner's claim of self-defense. Ground III of the petition is meritless.

**ACCORDINGLY**, the Magistrate Judge recommends that this action be, in all respects, dismissed.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the parties are given fourteen (14) days from being served with a copy of this Report and Recommendation to file with the Clerk of the Court any objections with supporting briefs. Failure to file timely written objections to the Magistrate Judge's recommendations may result in waiver of appellate review of factual and legal questions. *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996); *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

**DATED** this 29th day of January 2013.

KIMBERLY E. WEST
**UNITED STATES MAGISTRATE JUDGE**

11